**Opinion issued July 16, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-24-00120-CV**

———————————

## IN THE INTEREST OF E.F.K., A CHILD

---

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2023-00023J**

---

## MEMORANDUM OPINION

The trial court entered a decree terminating the mother's and father's parental rights as to their infant daughter and appointing as managing conservator the Texas Department of Family and Protective Services. The father does not appeal. The mother, however, does so, arguing that the evidence is insufficient to show she

committed one of the statutory predicate acts warranting termination or that termination is in her daughter's best interest. We affirm the trial court's decree.

## BACKGROUND

The mother has six children. The father of four of these children has been appointed as their sole managing conservator. The mother relinquished custody as to a fifth child. The present appeal solely concerns the mother's parental rights concerning the sixth and youngest of her children, a daughter, identified as E.F.K.

E.F.K.'s father was imprisoned and did not participate at trial. Her mother also did not appear at trial, ostensibly due to an ongoing medical or health problem. Her lawyer moved for a continuance of trial on a different ground, to allow the mother to complete in-patient drug rehabilitation, and the trial court denied the motion.

The first witness was Shetownya Montez, the Department's caseworker.

Montez testified that E.F.K. came into the Department's care due to the mother's use of illegal drugs. During her pregnancy with E.F.K., the mother was tested for drug use due to the pendency of an open case concerning another of her children. She tested positive for drugs several times while pregnant with E.F.K. There is no evidence that either the mother or the child tested positive for drugs at birth. But Montez did not believe the hospital drug tested the mother or E.F.K. at that time because the hospital in question was unaware of the mother's history.

The mother has a prior history of illegal drug use before this pregnancy. In a 2020 proceeding, the father of four of her children was appointed as their sole managing conservator due to the mother's drug use and neglectful supervision.

Since 2020, the mother has continued to have a serious drug problem. Montez testified that the mother's drugs of choice are methamphetamine and alcohol.

The Department prepared a family service plan for the mother. Among other things, the plan required her to obtain a stable job, but the Department was unable to verify employment. The mother provided the Department with a pay stub from an alleged employer, but the social security number on the stub did not match hers.

The plan also required the mother to obtain stable housing. While she showed that she lives with her own mother, the mother is not listed on her mother's lease. So, the mother lacks stable housing, as she has no control over her ability to remain.

The plan also required the mother to complete a substance-abuse assessment, which the mother did, but she was not accurate and honest about her abuse. In addition, she never completed the substance-abuse treatment plan that resulted from the assessment. The mother was unsuccessfully discharged by multiple treaters, and she never completed individual counseling recommended for substance abuse.

In general, the mother did not consistently try to complete substance-abuse counseling. Montez explained that the mother "would engage with the service provider and then she wouldn't respond for several weeks at a time." Or, when she

3

engaged, she was "not being honest." As a result of her disengagement and dishonesty, the counseling providers would have to unsuccessfully discharge her.

Montez testified she had been told the mother was presently in an in-patient drug-treatment program. Montez was unable to confirm this fact for herself but conceded that the child advocate had verified the mother was there. Montez testified that she remained concerned due to the mother's lack of contact. The mother had tried drug-counseling programs in the past but had not successfully completed one, and the mother continued to test positive for drug use after attempting treatment.

As part of her family service plan, the mother was required to submit to random drug testing, both urinalysis and hair-follicle tests. Montez testified that the mother did not show up to test many times. In addition, when the mother would show up to test, she would complete the urinalysis but refuse the hair-follicle testing. Because of the mother's refusal to submit hair for testing, it was not possible to definitively know whether she continued to use methamphetamine. Moreover, some of her urinalysis tests were negative but diluted, which indicates that the mother was trying to conceal illegal drug use or otherwise interfere with accurate drug testing.

The mother likewise did not successfully complete her parenting classes, though she may have done so in a prior case regarding one of her other children.

In essence, the mother did not demonstrate any change in behavior over time. Montez testified that the mother did not communicate, was unable to complete drug tests, and was generally unwilling to do things in a timely, appropriate manner.

The mother was also inconsistent in terms of visitation with E.F.K. Trial was held in early December 2023. The mother had not visited the child since June 2023. The mother's failure to visit stemmed at least in part from her failure to drug test. She was required to undergo urinalysis and a hair-follicle test at each visit, but she opted not to take these drug tests, even though they were a condition of visitation.

The mother was also inconsistent in terms of her attendance of meetings scheduled by child protective services. The mother had regularly attended court hearings up until the last one before trial. She was not present at the last one.

At the time of trial, E.F.K. was 11 months old. Montez testified that she is currently placed in the home of a caregiver who has adopted one of her siblings.

E.F.K. has special needs due to medical problems. She has been diagnosed with hyperthyroidism. In addition, E.F.K. is developmentally delayed, short in stature, and has feeding problems, decreased muscle tone, and chronic cough and congestion. As a result of these problems, she has several doctor visits each month. E.F.K. also has occupational therapy, speech therapy, and physical therapy weekly.

E.F.K. had a seizure in November 2023, which required emergency room visits. One of her therapists noted that the child is weaker on her left side, and this therapist has recommended that the child have an MRI, which remained pending.

Montez testified that an unstable home environment could result in E.F.K.'s death, or a decline in health at the very least, due to her serious medical needs. Montez opined that the mother was not able to provide the stability E.F.K. needs. The mother had not even asked for updates or documentation about E.F.K.'s care.

In contrast, Montez testified the E.F.K.'s current placement is able to meet the child's needs. There, E.F.K. is doing well and all of her needs are being met. Her primary caregiver is a former nurse well suited to continue meeting E.F.K.'s needs. This caregiver has expressed the desire to meet E.F.K.'s needs in the long term.

Montez opined that it was in E.F.K.'s best interest to remain in her current placement, where she is with one of her siblings and a caregiver who is capable of meeting the child's needs. The Department's goal was the termination of the mother's and father's parental rights to facilitate adoption by the current caregiver.

The Department had explored the possibility of placing E.F.K. with a blood relative, Montez testified. However, the Department's efforts were not successful.

Jessica Dunlap, who was the child advocate in this case, testified next.

Dunlap also testified about E.F.K.'s medical needs, noting that she must take medicine for her hyperthyroidism before she eats every morning. Other medical

6

needs have become apparent over time. For example, E.F.K. has trouble swallowing and requires a special formula. Dunlap also testified about E.F.K.'s recent seizure and the need for an MRI to determine whether the child has a neurological issue.

The child's medical issues aside, Dunlap described E.F.K. as "a sweet, darling baby" who has "recently started to crawl" and "loves playing with her toys." Overall, Dunlap opined, E.F.K. has "been doing fabulous" in the home of her caregiver.

Dunlap testified that the caregiver works full time but does so from home. Consequently, Dunlap testified, the caregiver is able to pick up E.F.K. from daycare.

Dunlap testified that she has spoken with the mother "a few times." But her communication with the mother "has been extremely inconsistent" because the mother "will not respond for several weeks, sometimes a couple of months." Dunlap's most recent contact with the mother occurred the preceding day, when Dunlap met her at an in-patient drug-treatment facility. However, Dunlap testified that, on the day of trial, the case manager at the facility confirmed that the mother was no longer there. The case manager said the mother had left to come to court.

Dunlap further testified that during her visit with the mother the day before trial, the mother was not aware of the extent of E.F.K.'s medical needs. The mother was aware of the child's hyperthyroidism but was not aware of any other issues.

Dunlap recommended that the mother's and father's parental rights be terminated to facilitate the adoption of E.F.K. by her current primary caregiver.

7

Finally, E.F.K.'s primary caregiver, her foster mother, took the stand. The foster mother testified that E.F.K. was placed in her care about a month after birth.

The foster mother adopted E.F.K.'s older brother the month before trial. If it became possible to do so, the foster mother said she intended to adopt E.F.K.

Like the others, the foster mother testified about E.F.K.'s health issues. Given the extent of these health issues, the child's medical providers have told the foster mother that E.F.K. will require a good deal of medical care for quite a while.

The Department introduced several documents into evidence, including the affidavit made to support removal of E.F.K. from her mother's care, the mother's family service plan, the child advocate's report, the mother's mental-health and substance-abuse assessment, and records relating to the mother's drug tests. These documents corroborate Montez's and Dunlap's testimony about the mother's parental shortcomings, her drug use in particular. In addition, the substance-abuse assessment notes the mother was "dishonest" about "her drug use, CPS history, and services that she claimed she completed." For example, as to her drug use, the mother claimed she "last used meth[amphetamine] in 2021; however, she tested positive for it in March 2023," a result confirmed by follow-up testing afterward. The drug-testing records confirm these positive hair-follicle test and follow-up test results.

The mother did not call any witnesses or introduce any other evidence.

8

The trial court entered a decree terminating the mother's and father's parental rights. As to the mother, the trial court did so based on findings of child endangerment, constructive abandonment, and dangerous use of a controlled substance. *See* TEX. FAM. CODE § 161.001(b)(1)(E), (N), (P). The trial court further found that termination was in the child's best interest. *See id.* § 161.001(b)(2).

The mother appeals.

## DISCUSSION

On appeal, the mother concedes the evidence is legally and factually sufficient to support the trial court's termination findings relating to child endangerment and dangerous use of a controlled substance. *See id.* § 161.001(b)(1)(E), (P). However, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's constructive-abandonment finding. *See id.* § 161.001(b)(1)(N). In addition, the mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of her parental rights is in E.F.K.'s best interest. *See id.* § 161.001(b)(2). In particular, the mother argues there was "little to no evidence as to why termination was in the best interest of the child."

### Legal Standard for Terminating Parental Rights

A parent's rights to the care, custody, and management of his or her child are constitutional in scope. *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). But parental rights are not absolute; the

Department may seek termination of the rights of those who are not fit to accept the responsibilities of parenthood. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). The primary focus in a termination suit is protecting the child's best interest. *Id.*

To terminate parental rights under the Texas Family Code, the Department must establish that a parent committed one or more statutorily enumerated predicate acts or omissions and that termination is in the child's best interest. FAM. § 161.001(b)(1)–(2). The Department need only establish one of these statutorily enumerated predicate acts or omissions, along with the best-interest finding. *See id.*; *In re A.V.*, 113 S.W.3d at 362. But the Department must make these showings by clear and convincing evidence. FAM. § 161.001(b). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

The best-interest inquiry is separate and distinct from the one concerning the predicate grounds for termination of parental rights. *In re A.J.D.-J.*, 667 S.W.3d 813, 821 (Tex. App.—Houston [1st Dist.] 2023, no pet.). But evidence used to prove predicate grounds for termination may be probative of a child's best interest. *In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied).

Multiple nonexclusive factors bear on a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These nonexclusive factors include:

- the child's desires;

10

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of those seeking custody;

- the programs available to assist them to promote the child's best interest;

- their plans for the child or the plans of the agency seeking custody;

- the stability of the home or proposed placement;

- the acts or omissions of the parent that may indicate the existing parent–child relationship is not proper; and

- any excuse for the parent's acts or omissions.

*Id.*; *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). These nonexclusive factors are not exhaustive, no one factor is controlling, and a single factor may be adequate to support a finding that termination of the parent–child relationship is in a child's best interest on a particular record. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re J.M.T.*, 519 S.W.3d 258, 268 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

In evaluating a child's best interest, we also may consider several factors set forth in section 263.307 of the Family Code. *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see* FAM. § 263.307(a)–(b) (stating that prompt placement of child in safe environment is presumed to be in child's best interest and enumerating 13 factors courts should consider in deciding whether child's parents are willing and able to provide child with safe environment).

11

**Legal and Factual Sufficiency Review in Termination Cases**

In this appeal, the sole issues are legal and factual sufficiency of the evidence. Due to the elevated burden of proof in a termination suit—clear and convincing evidence—we do not apply the traditional formulations of legal and factual sufficiency on appeal. *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also* FAM. § 101.007 (clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations").

In a legal-sufficiency review in a termination case, we cannot ignore undisputed evidence contrary to a finding, but we must otherwise assume the factfinder resolved disputed facts in the finding's favor. *In re A.C.*, 560 S.W.3d at 630–31; *see In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014) (reviewing court credits evidence supporting finding if reasonable factfinder could and disregards contrary evidence unless reasonable factfinder could not). The evidence is legally insufficient if, viewing all the evidence in the light most favorable to a finding and considering undisputed contrary evidence, a reasonable factfinder could not form a firm belief or conviction that the finding is true. *In re A.C.*, 560 S.W.3d at 631.

In a factual-sufficiency review in a termination case, we must weigh disputed evidence contrary to a finding against all the evidence in the finding's favor. *Id.* We consider whether the disputed evidence is such that a reasonable factfinder could not resolve the conflicting evidence in the finding's favor. *Id.* The evidence is factually

12

insufficient if, in view of the entire record, the disputed evidence that a reasonable factfinder could not credit in the finding's favor is so significant that the factfinder could not have formed a firm belief or conviction that the finding is true. *Id.*

In reviewing for evidentiary sufficiency, however, we must not usurp the factfinder's role. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). Deciding whether, and if so to what degree, to credit the evidence is the factfinder's role, not ours. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009). The factfinder is the sole arbiter of witness credibility. *Id.*; *In re J.S.*, 584 S.W.3d 622, 634 (Tex. App.—Houston [1st Dist.] 2019, no pet.). In a bench trial, the trial judge is the factfinder who weighs the evidence, resolves evidentiary conflicts, and evaluates witnesses' credibility. *In re R.J.*, 579 S.W.3d 97, 117 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

**Analysis**

*Constructive-Abandonment Finding*

Though the mother challenges the trial court's constructive-abandonment finding under section 161.001(b)(1)(N), she concedes legally and factually sufficient evidence supports its findings of child endangerment under section 161.001(b)(1)(E) and dangerous use of a controlled substance under section 161.001(b)(1)(P).

Because a single predicate finding under section 161.001(b)(1) will support a trial court's decree terminating a parent's rights, we need not review the mother's

13

challenge regarding constructive abandonment. *See In re A.V.*, 113 S.W.3d at 362 (stating that only one statutory predicate act or omission finding is necessary).

There is an exception to this general rule. We must review a challenged child-endangerment finding made under section 161.001(b)(1)(D) or section 161.001(b)(1)(E) even if the trial court found termination was warranted based on another predicate act or omission that is unchallenged due to the potential impact of a child-endangerment finding in a future parental-termination proceeding. *See* FAM. § 161.001(b)(1)(M) (providing for termination when parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)"); *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019) (per curiam) (holding that failure to review child-endangerment findings made under section 161.001(b)(1)(D) or (E) "when the parent has presented the issue to the court" violates parent's constitutional rights).

But constructive-abandonment findings do not fall within this exception. *See, e.g.*, *In re M.A.J.*, 612 S.W.3d 398, 408 (Tex. App.—Houston [1st Dist.] 2020, pet. denied) (holding that evidence was legally sufficient to support finding that termination was warranted under section 161.001(b)(1)(E), so court of appeals did not have to address contention that evidence was legally insufficient to support constructive-abandonment finding made under section 161.001(b)(1)(N)).

We overrule the mother's constructive-abandonment challenge.

### *Best-Interest Finding*

The mother argues her "offending behavior, on its own" is not "egregious enough to warrant a finding that termination is in the child's best interest." She asserts consideration of the *Holley* factors do not support termination. We disagree.

As often is the case, the mother's use of illegal drugs, methamphetamine in particular, is the crux of the case for the termination of her parental rights. Evidence of a parent's mere use of illegal drugs, standing alone, will not necessarily support a finding that the termination of his or her parental rights is in a child's best interest. *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied) (noting that illegal drug use is recurring theme in parental-termination appeals but observing that evidence of drug use does not invariably constitute legally and factually sufficient evidence to support termination of parental rights). The law does not require parents to maintain perfect sobriety or forfeit their children. Here, however, clear and convincing evidence shows the mother's use of illegal drugs adversely impacts her ability to parent to such a significant degree that she effectively has prioritized the pursuit of intoxication over E.F.K.'s wellbeing.

E.F.K. came into the Department's care soon after she was born due to her mother's illegal drug use during pregnancy. E.F.K., who was just under one year of age at trial, has never been in her mother's care. The mother had not even seen E.F.K. in the six months preceding trial due to her refusal to take required drug tests.

15

Methamphetamine is the mother's drug of choice. While many of the details of her use of methamphetamine remain unknown, this dearth of information is attributable to the mother's refusal to be honest with her treatment providers as well as her failure to attend trial and testify in opposition to the termination of her rights.

Regarding the mother's failure to attend trial, her lawyer moved to continue trial to allow the mother to complete an in-patient rehab program. The trial court denied that motion, and the trial court later heard testimony that the mother reportedly had left the facility to attend trial. Yet, the mother never arrived.

Previously, the mother was discharged unsuccessfully by more than one drug-treatment provider due to her failure to consistently pursue treatment and her dishonesty about her drug use. She was similarly dishonest in the substance-abuse assessment she completed as part of her family service plan in this proceeding.

This proceeding is not the first one in which the mother's drug use has cost her custody of a child. She has six children, and none of them are in her care. In 2020, the father of four of her children was appointed to be their sole managing conservator due to the mother's drug use and neglectful supervision. The fifth child was recently adopted by the same foster mother who currently cares for E.F.K.

The results of a March 2023 drug test show that the mother was still using methamphetamine during the pendency of this proceeding. While there are negative drug tests in the record as well, the mother has also refused many drug tests. In

16

particular, she has refused hair-follicle tests, which are well-known to reveal drug use over a longer span of time than urinalysis. There also was evidence the mother diluted some urine samples in an apparent attempt to thwart positive test results.

The mother completed very little of her family service plan during the pendency of this case. No evidence suggests she made serious efforts. There is evidence she was not honest about her efforts. She claimed to have obtained a job but then submitted a pay stub with a social security number other than her own.

In sum, the evidence shows hard drug use by the mother over a long enough period of time that it has interfered with her ability to parent all six of her children, and the evidence also shows persistent dishonesty on her part about her drug use and other subjects. There is little positive evidence to juxtapose with these showings.

This record constitutes clear and convincing evidence that supports the trial court's finding that termination of the mother's parental rights is in E.F.K.'s best interest. As we have explained in the past, when the record shows a continuing pattern of serious illegal drug use, this evidence implicates most of the *Holley* factors and will support a trial court's best-interest finding in favor of termination. *Id.*

Of particular significance, we note that based on the record before us the trial court could have found the evidence clearly and convincingly shows the mother:

- used illegal drugs while pregnant with E.F.K.;

- favors methamphetamine in particular, a so-called hard drug that is more dangerous and debilitating in nature than some others;

17

- has repeatedly sought rehabilitation without any notable success;

- has not been honest with treaters and others about her illegal drug use;

- tested positive for methamphetamine use during this case, even though she knew her parental rights as to E.F.K. were in jeopardy;

- took measures to conceal her drug use from the court, including refusing to provide hair-follicle samples and adulterating urine samples; and

- has persisted in using methamphetamine over time, despite adverse consequences, including the loss of custody of five other children.

Based on this evidence, the trial court could have further found the mother has a drug problem that is so serious as to make the termination of her parental rights in her child's best interest. *See* FAM. § 263.307(b)(8) (including "whether there is a history of substance abuse" by child's family among factors that "should be considered by the court" when "determining whether the child's parents are willing and able to provide the child with a safe environment"); *In re E.D.*, 682 S.W.3d at 607–10 (relying on evidence of similar kind to that summarized above in concluding that legally and factually sufficient evidence supported best-interest finding).

We further note that the trial court could have found based on the evidence before it that the mother intentionally absented herself from trial. From this circumstance, the court could have further found that the mother was either indifferent to the potential loss of her parental rights or else so in the grip of her addiction as to be incapable of prioritizing her relationship with E.F.K. over drugs.

18

*See In re A.J.D.-J.*, 667 S.W.3d at 826–27 (holding factfinder can infer indifference about loss of rights from parent's failure to attend trial without valid excuse).

As a consequence of her drug problem, the mother has played almost no role in E.F.K.'s life to date, and she has repeatedly behaved in ways that signal she either does not care to raise E.F.K. or has rendered herself incapable of doing so. *See id.* at 828–30 (concluding limited but virtually one-sided evidence showing mother had never truly parented one-year-old child and was uninterested in doing so supported best-interest finding). These circumstances are sufficient to support termination.

On appeal, the mother acknowledges that "permanency for a child is of paramount importance" but argues that in this instance "this goal should not be rushed into at the expense of breaking the parent–child relationship forever." Emphasizing that she "was seeking rehabilitation and sobriety at trial," the mother maintains that permanency "can be achieved without terminating" her rights.

On this record, however, the trial court could have found that not terminating the mother's rights would keep E.F.K. in limbo indefinitely. The trial court heard evidence the mother had left the rehabilitation facility to attend trial, but she never showed at trial. Thus, contrary to the mother's assertion, the trial court was not obliged to agree the mother remained at the facility at the time of trial. But assuming for argument's sake the mother did so, the trial court was not required to credit evidence that she checked herself into rehab shortly before trial over evidence of her

serious illegal drug use over an extended period of time, which included failed rehabilitation attempts and repeated dishonesty about her illegal drug use.

Here, little or no evidence suggests that the mother will be prepared to parent E.F.K. in any meaningful way in the future. Indeed, given her refusal to take the drug tests necessary to visit her child, the trial court could have reasonably found that even a more limited relationship consisting of visitation was unlikely. On a record like this one, termination is in the child's best interest because it allows the child the possibility of a stable life with another who is willing and able to provide a safe home. *See* FAM. § 263.307(a) (providing that prompt and permanent placement of child in safe environment is presumed to be in child's best interest); *In re E.D.*, 682 S.W.3d at 612 (observing that certainty and permanence cannot be achieved as long as parental rights remain intact and concluding that trial court "was not obliged to opt for a disposition less severe than termination in the face of clear and convincing evidence that the mother has a continuing drug problem that likely will prevent her from discharging her parental responsibilities going forward").

We overrule the mother's best-interest challenge.

## CONCLUSION

In conclusion, viewing all the evidence in the light most favorable to the trial court's best-interest finding and considering undisputed contrary evidence, we hold the trial court could have reasonably formed a firm belief or conviction that

20

termination of the mother's parental rights is in the best interest of the child. Therefore, the evidence is legally sufficient to support the termination decree. Furthermore, in view of the entire record, we hold the disputed evidence the trial court could not have reasonably credited in the best-interest finding's favor is not so significant that the trial court could not have formed a firm belief or conviction that termination of the mother's parental rights is in the best interest of the child. Thus, the evidence likewise is factually sufficient to support the termination decree.

We affirm the trial court's decree terminating the mother's parental rights.


Gordon Goodman
Justice

Panel consists of Chief Justice Adams and Justices Kelly and Goodman.